**NAVIGAZIONE ALTA ITALIA,**
Appellant,

v.

**COLUMBIA CASUALTY COMPANY,**
Appellee.

No. 16992.

United States Court of Appeals
Fifth Circuit.

May 21, 1958.

George F. Wood, Mobile, Ala., Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., of counsel, for appellant.

Thomas E. Twitty, Mobile, Ala., Inge & Twitty, Mobile, Ala., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

The suit was on a standard form Manufacturers and Contractors Liability Pol-

icy, with special indorsement attached,[1] taken out by Walsh Stevedoring Co., Inc., for a policy period from November 1, 1951, to November 1, 1952, to afford protection to steamship owners and charterers for whom Walsh was loading or unloading. Providing that Columbia Casualty Company "does hereby agree with the insured named in the declarations made a part hereof", it recited, as in Special Endorsement No. 1, that it was issued to "principals whether steamship owners or charterers for whom Walsh Steamship Company is loading or unloading".

Filed November 22, 1955, the suit was brought by plaintiff to recover amounts paid by it in preparing for and defending a suit for damages for personal injuries against the Steamship Monginevro and in satisfaction of a judgment obtained thereon on March 16, 1954, by one William Andrews, a longshoreman employed by Walsh.

Alleging, its ownership of the steamship, the injury to Andrews on May 8, 1952, in the course of a discharging operation in Mobile which was being carried out by Walsh Stevedoring Company, the filing by Andrews of a libel against the Monginevro, the trial and judgment in the action, and the payment by it of $20,354.08 in payment and satisfaction of the judgment, and of attorneys' fees, expenses and costs which it had been compelled to incur, it further alleged that it was the insured in the policy on which it sued, and that the defendant, as insurer, had agreed to pay and had become liable for the sums sued for.

In lieu of alleging compliance with the conditions of the policy,[2] plaintiff averred in its complaint, to which the policy was attached, that *it was not aware of the existence of the policy* until October, 1955, and that promptly upon learning of its existence plaintiff made demand for payment, and the demand was denied in writing.

Defendant, pointing out that the policy sued on expressly provides in Condition No. 11: "No action shall lie against the company unless as a condition precedent thereto the insured shall have fully complied with all of the terms of the policy", and that plaintiff has not alleged com-

---

1. Item 1 of the policy reads: "Name of Insured—See Special Endorsement No. 1."

Special Endorsement No. 1, as material here, reads:

"Item One (1) of the policy to which this endorsement is attached shall read 'Any Steamship Company and its principals whether steamship owners or charterers, for whom Walsh Stevedoring Company is loading or unloading, * * ' "

2. Those pertinent here are:

"8. Notice of Accident. Upon the occurrence of an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place, and circumstances of the accident, the names and addresses of the insured and of available witnesses."

"9. Notice of Claim or Suit. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

"10. Assistance and Co-operation of the Insured. The insured shall co-operate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits; and the company shall reimburse the insured for expenses, other than loss of earnings, incurred at the company's request. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident."

"11. Action against Company. No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and the company."

pliance with any of them, moved to dismiss the suit.

The district judge sustained the motion, and this appeal followed.

Here appellant insists that since *it did not know of the existence of the policy at the time of the occurrence of the accident, the filing and trial of the suit, the obtaining, and the payment, of the judgment therein,* it could not comply with the conditions of the policy for notice of accident and suit and cooperation with the insurer, and thus was released from the conditions prescribed in the policy as precedent to action on it.

On its part, appellee points, to the prime importance to the insurer of compliance by the insured with the conditions precedent to liability, particularly those ensuring it an opportunity to investigate and defend against the claim, and to the admitted fact that because of the want of compliance by the insured with these conditions the insurer has been finally and completely deprived of these rights.

So pointing, it insists that it is in complete contradiction both of the letter and the spirit of the policy for the appellant to contend: that, because of the fact alone that it did not know of the existence of the policy, appellee, though it has had no opportunity to have any part or say, in the consideration and determination of what should be done about the claim, in the preparation for and defense of the suit, or in the incurring of the expenses and attorneys' fees, must pay the whole account; that, in short, appellee must not only dance to the tune appellant calls but must pay the piper for calling it.

Appellee in its brief thus well states its plight:

"We wish to place emphasis on the fact that we are not dealing with a case where there was a *mere delay* in giving notice of an accident, or *delay* in giving notice of a claim, or *delay* in giving notice of a suit, or *delay* in forwarding suit papers to the insurer. In this case, no such notice was ever given and no such papers were ever forwarded to Appellee. The Appellee was never notified of the accident, and was *never* given notice of any claim, and was *never* notified of any suit. No suit papers were ever forwarded to Appellee. All that the Appellee ever received was a demand in November, 1955, to pay a judgment, which demand was made over *three years* after the accident occurred and over a year and a half after the judgment was obtained. A demand that a judgment be paid is by no means a notice of an accident or of a claim or suit! At the time of the demand, the house was not merely on fire—it had already burned to the ground!"

In addition to this fundamental attack on the appellant's claim that solely because of its lack of notice of the existence of the policy it should be allowed to recover on it, though none of its conditions have been complied with, appellee presents an additional reason for denying appellant's claim.

This is that, if appellant is right in claiming that it was in fact without notice of the existence of the policy until shortly before it made claim upon it, it would be excused for not giving earlier notice, there is no basis in the record for the claim that it was without earlier notice, for, under cases such as Johnson v. Maryland Cas. Co., 73 N.H. 259, 60 A. 1009, and Metropolitan Life Ins. Co. v. Henry, 217 Ind. 33, 24 N.E.2d 918, the knowledge of Walsh who took the policy out for plaintiff's benefit was in law notice to the plaintiff.

 We find ourselves in agreement with both of the positions taken by appellee. The arguments presented and the authorities cited by appellant, such as Sanderson v. Postal Life Ins. Co., 10 Cir., 87 F.2d 58 and Standard Accident Ins. Co. v. Alexander, 5 Cir., 103 F.2d 500, are wholly inapposite, indeed unrelated to the facts of this case. Without exception the cases it relies on deal with situations in which the failures to comply with the conditions of the policy consisted of

mere delay in giving notice, a delay from which no real prejudice resulted. Cf. Young v. Travelers Ins. Co., 5 Cir., 119 F.2d 877, cited and relied on by appellant, which at page 880 well states the principle controlling here. Pointing out that the vital question in notice cases is whether prejudice has resulted from the delay, the court concluding its thorough discussion of that question said of it:

> "In its nature it was one to which the doctrine of prejudice vel non has peculiar application. There was no prejudice. The notice clause was not breached."

A recent case from this court illustrative of the point is St. Paul Mercury Indemnity Co. v. Valdosta Milling Co., 5 Cir., 253 F.2d 667. We held there that since, when the insurer received belated notice thereof, the suit which it had contracted to defend was still pending and could still be defended, the insurer, under the circumstances of the case which excused the insured's delay, was obligated to assume the defense and defend the suit.

In none of the cases cited did the failure consist, as here, of a total, absolute, and final failure to give notice, a failure completely fatal to the insurer and in undoubted breach of its contract. Here, depriving the insurer, by its failure to comply with the conditions of the policy, of all opportunity to defend against the claim, and thus completely abrogating its contract, the insured presents it with a fait accompli in the form of a final and satisfied judgment obtained in a suit in the defense of which the insurer has been deprived of all effective part.

The judgment was right. It is affirmed.

---

a In Item 3 the only coverage specified was Coverage A (bodily injury liability) for "3. Independent Contractors" with limits of $25,000/$50,000. In the "Definition of Hazards" the policy described the coverage:
 "Division 3. Independent Contractors. Operations performed *by* independent

JOHN R. BROWN, Circuit Judge (dissenting).

Were this, as the Court intimates, a problem growing out of the standard form Manufacturers and Contractors Liability Policy or any one of the similar types of automobile or public liability policies so frequently coming before us, I would concur in this decision. For we have recognized that notice to an insurer of an occurrence likely to give rise to a claim or liability is a vital thing. Yorkshire Indemnity Co. of New York v. Roosth & Genecov Production Co., 5 Cir., 252 F.2d 650; Dunn v. Travelers Indemnity Co., 5 Cir., 123 F.2d 710.

But we are not here dealing with an ordinary policy. We are not here concerned with a common form of insurance. What we have here is an extraordinary insurance contract. Indeed, to those plagued with the post-Sieracki problem of third party claims of longshoremen against vessels *(in rem or in personam)*, this is a remarkable cover. To call it unique is a modest understatement. To think it revolutionary would scarcely be an exaggeration.

For this policy was written primarily for the benefit and protection, not of Walsh Stevedoring Company, the initial nominal named assured; it was, as note 1 of the Court's opinion sets forth, written for the benefit of owners, operators and charterers of vessels for which Walsh was the stevedoring contractor. Indeed, in the original printed form of the policy, it was intended to cover liabilities imposed on Walsh by reason of acts done *for* it by persons acting as independent contractors for Walsh.[a] It did not even pretend to cover Walsh's liability f·· its own acts under any arrangement where it was an independent contractor acting *for* others (such as steamship

---

contractors and omissions or supervisory acts of the insured in connection with work performed *for the named insured* by independent contractors, during the policy period, other than maintenance and ordinary alterations and repairs on premises owned or operated by the named insured." (Emphasis supplied.)

owners).[b] The only way the policy became of any value whatsoever with respect to situations in which Walsh was acting as an independent contractor for others was by the addition of the special "Independent Contractors Extension Schedule" which, in addition to Endorsement No. 1 (note 1 of the Court's opinion), showed that the policy was "issued to: principals whether steamship owners or charterers for whom Walsh Stevedoring Co. is loading or unloading." The policy then came into being to cover the very liability involved in the Andrews libel against the S.S. Monginevro. It was that liability, and virtually only that liability, which the Insurer undertook to cover. And not only that, the Insurer, receiving substantial premiums[c] for this limited coverage, was in no sense the abused or imposed-on payer. To the contrary, it had been well paid and it was the Assureds (both Walsh and steamship owner) who could rightfully demand performance of this basic provision of the policy—to pay on behalf of the Assured all liabilities imposed on him by law.[d]

When the Insurer issued this policy it is bound to have known that it was taking on awesome obligations. For the effect of this revolutionary coverage was to lift from the overburdened shoulders of the shipowner the portentous limitless and virtually absolute liabilities following in the wake of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698, and place them in the willing hands of the Insurer as its new and assumed obligation. It knew, for example, that it was insuring the absolute warranty of seaworthiness of any and all vessels, no matter what their age, classification, flag, ownership, state of fitness, maintenance, upkeep or repair, with the sole underwriting criteria being that the ship was to be loaded or discharged by Walsh. Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, 1954 A.M.C. 1; The Law of Admiralty, Gilmore & Black, 1957, §§ 6–53—62. It knew as well that under the new and extended doctrine of vicarious seaworthiness it was insuring on behalf of these unknown shipowners and their *sea* or *un*seaworthy vessels the absolute fitness of any and all transitory gear and equipment which Walsh, the contracting stevedore, might bring aboard for the performance of its contract. Alaska S.S. Co., Inc., v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, 1954 A.M.C. 860, reversing per curiam 9 Cir., 205 F.2d 478, 1953 A.M.C. 1405, and Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, 1954 A.M.C. 1088, reversing per curiam 3 Cir., 205 F.2d 57, 1953 A.M.C. 1679.

Moreover, since Walsh was also a named Insured, it knew that if its addi-

---

[b] These liabilities would be covered under the described "Hazards" of "1. Premises—Operations" and "4. Products" as to each of which in the policy declaration sheet an "X" appeared in the column marked "Advance Premiums." The policy stated: "The letter 'X' in any 'Advance Premium' space shall mean that insurance is not afforded with respect to the hazards stated in the division opposite thereto."

[c] The "Independent Contractor's Extension Schedule" reflects that the premium, based on an estimated total annual payroll of $500,000 was .30 for an estimated annual premium of $1500. Special endorsements for three named steamship companies (of which the owner of the S.S. Monginevro was not one) prescribed limits of $100,000/$500,000 and $50,000/$150,000 at rates of .310 to .395. But no other premium rate was indicated in the policy. By special Endorsement No. 5 an advance premium of $1500 was charged and collected. As no other premium rate was indicated by endorsement or policy term, it is clear that by operation of the "X" system on the declaration sheet, note b, supra, the only real coverage afforded was to shipowners, not Walsh.

[d] "1. Coverage A—Bodily Injury Liability: To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the hazards hereinafter defined."

tional Assured (the shipowner) were held to any one of these numerous absolute liabilities for anything done or not done by either shipowner, stevedore or both to the detriment or harm of a longshoreman, it could not, as other shipowners had done, or attempted to do, Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 349 U.S. 901, 75 S.Ct. 575, 99 L. Ed. 1239; Id., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 1955 A.M.C. 1422; Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; cf. American Stevedores, Inc., v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011, 1947 A.M.C. 349; Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, 1952 A.M.C. 1; Czaplicki v. S.S. Hoegh Silvercloud, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387, 1956 A.M.C. 1465, palm off all or a part of it onto the party really at fault—the stevedoring company.

Not only did it voluntarily take on obligations of an absolute character arising out of operations over which it would have no safety control occurring on vessels beyond its right of survey, approval or acceptance, but it had to recognize that these liabilities could be asserted all over the world whenever and wherever the ship or shipowner could be found with no way of even prophesying when the claims would be barred by statutes of limitations, either of the forum or of Alabama,[e] or would become stale under the more elastic notion of laches in libels either *in rem* or *in personam* filed in admiralty.[f]

I do not think that an underwriter can fairly take $1500 as an estimated annual premium plus the further sum of 30¢ per $100 payroll for workers including the

injured Andrews as well, and then divorce itself from the unique situation into which that contract has unavoidably, but voluntarily, carried it.

All this is relevant, not because of any supposed notion that the fine print exclusions are obnoxious, but because it is this contract with its extraordinary and far-reaching obligations which bears upon the interpretation of its own terms. What the policy does and what the policy does not require bears repeating:

"8. Notice of Accident. Upon the occurrence of an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents *as soon as practicable.* Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place, and circumstances of the accident, the names and addresses of the insured and of available witnesses."

The contract requires notice "as soon as practicable." The policy does not attempt to specify in point of specific times just when the notice shall be given. "Practicable" is the standard which the Insurer has itself fixed. It is not even as broad or flexible as the term frequently found either in contracts or the law generally fixing the standard of time as "reasonable."

It is hardly "practicable" for one to give a notice when he does not know either that the notice is required, or that a relationship exists giving rise to the necessity for notice. On the other hand, it is as soon as "practicable" if notice is

---

e Indeed, the place of possible occurrences was not limited to Alabama. Walsh, as stevedore, might improperly stow cargo causing injury at a subsequent unloading port in the United States or abroad, or one of its longshoremen might rig up some crude shelter which, remaining aboard, caused injury at a subsequent port. This is what occurred in Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp. and Weyerhaeuser S.S. Co. v. Nacirema Operating Co., supra.

f See, e. g., Moore v. Palmyra Compania Naviera, S.A., S.S. North Queen, 5 Cir., 253 F.2d 712, an appeal also from the Southern District of Alabama, reversing the Trial Court's determination that, as a matter of law, the Alabama (the place of injury) one-year, rather than the New York (place of forum prior to 28 U.S.C.A. § 1404 transfer) six-year, statute of limitation applied. See also McDaniel v. Gulf & South American S.S. Co., 5 Cir., 228 F.2d 189.

given immediately on learning of the relationship, the party, and the necessity for it.

When this Underwriter, for any and all shipowners and vessels who would come into the relationship with Walsh Stevedoring Company acting as independent contractor, took upon itself the far-reaching obligations of this contract to cover the extraordinary and limitless liabilities of such unknown parties which could be asserted by unknown people beyond the control of any and at unpredictable times and places, it is, at least on the basis of the mere pleadings, bound to have realized that its assured might not know of the existence of the policy and the duty of notification until long after the events involved.

Contrary to the great sense of shock seemingly registered by the Court to the idea that notice is timely if given as soon as the existence of the policy and coverage become known, the law is uniform that this is precisely so. While I have pointed out the unique aspects of this policy, on this feature it is exactly the same as the typical automobile insurance policy with its now familiar Omnibus Clause. (See e. g., Risjord & Austin, Automobile Liability Insurance Cases, Standard Provision 1947 Basic Auto Policy, III, p. 4, and 1955 Basic Auto Policy, III, p. 19.) As to them no less an authority than Appleman, Insurance Law and Practice, §§ 4738, 4745, pages 124, 143, categorically states:

> "An additional insured, operating an automobile with the permission of the owner, has been held to be a proper person to give notice to the insurer. Such additional insured could not be expected nor required to give notice before he knew of the existence of the policy or of the fact that he was covered thereby.
>
> \* \* \* \* \* \*
>
> "An insured's lack of knowledge of the existence of insurance excused a delay in giving notice, as a matter of law, where he was not guilty of a lack of due diligence.

> And an additional insured was under no duty to give notice, until he had knowledge that he was covered by the policy."

In support of this, Appleman, with full basis, cites Scott v. Inter-Insurance Exchange of Chicago Motor Club, 352 Ill. 572, 186 N.E. 176, affirming 267 Ill.App. 105; Unverzagt v. Prestera, 339 Pa. 141, 13 A.2d 46; Dixon v. United States Fidelity & Guaranty Co., Mo.App., 155 S.W.2d 313; R. H. Macy & Co. v. General Accident, Fire & Life Assurance Corp., 4 Misc.2d 89, 148 N.Y.S.2d 10, and Pitts v. Aetna Casualty & Surety Co., 2 Cir., 218 F.2d 58, certiorari denied 348 U.S. 973, 75 S.Ct. 535, 99 L.Ed. 757. And to these may be added the recent case Jameson v. Farmers Mutual Auto Ins. Co., 181 Kan. 120, 309 P.2d 394. See also Spradlin v. Columbia Ins. Co., 34 Tenn.App. 17, 232 S.W.2d 605, and Whitehead v. National Casualty Co., Tex. Civ.App., 273 S.W.2d 678, error refused, and especially the latter which collects a large number of cases showing this to be the uniform rule in life, health and accident policies.

While the Court labors at underwriting factors which are for the Insurer to assay, Maryland Casualty Co. v. Southern Farm Bureau Casualty Ins. Co., 5 Cir., 235 F.2d 679, 683, its emphasis on paragraphs 9, 10 and 11 of the policy, see note 2 of the Court's opinion, supra, involves, in my judgment, two errors. First, it ignores the basic coverage provided, note d, supra, to pay liabilities imposed by law on the assured. Defense is an additional obligation, but the fact that the insurer does not defend affords no escape if the coverage existed. United Services Automobile Association v. Russom, 5 Cir., 241 F.2d 296, 301. And second, if notice, given immediately after learning of the existence of the policy, is "as soon as practicable," there has been a compliance with the policy conditions even though it has come after judgment and without an opportunity to defend. Such a consequence might be unusual to be

sure, but uniqueness is the major and minor theme of this entire contract.

Since this was the disposition of the case on bare pleadings, a result which hardly ever nowadays passes muster under F.R.C.P. 8, 28 U.S.C.A., Carss v. Outboard Marine Corp., 5 Cir., 252 F.2d 690, the truth has forever been foreclosed. For all we know this admiralty case defended by able and vigorous proctors whose competence their adversaries would be the first to champion, was the now familiar one of open and shut liability in which the extravagant demands for settlements left no alternative but to let a Federal District Judge "call the tune." If to a reasonable Judge, to reasonable, competent and skilled proctors familiar with the limitless depths of this sea of absolute liability, the handling, disposition and result of the admiralty suit was a fair one, it would be presumptuous, at this stage, to say that this Underwriter, going into this arrangement with its eyes (and perhaps its head) wide open must necessarily have been prejudiced. For all we know Andrews may have been extensively injured by the breaking of stevedoring gear imposing absolute liability on the vessel under Petterson and Rogers, supra. Investigation and defense of such is but a pretense and whether prejudice resulted would really be a question whether the shipowners' proctors, rather than those now appearing for this Insurer, would have more artfully carried out the delicate tactical and strategic phases of the so-called amicable settlement process. If such were the case, the prejudice would be from the failure (assumed) to make a proper settlement. But such prejudice would not relieve the Insurer altogether. It should do no more than reduce the liability by the difference between the judgment entered after an adversary trial and the best good faith offer of settlement made prior to trial. This poses no problem beyond the capacity of the law for it is but a variant of the situation in which an insurer is held liable beyond the policy limits for failure to make a proper settlement. See, for example,

American Fidelity & Casualty Co. v. Greyhound Corp., 5 Cir., 232 F.2d 89; Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App., 15 S.W.2d 544; Linkenhoger v. American Fidelity & Casualty Co., 152 Tex. 534, 260 S.W.2d 884; United Service Automobile Ass'n v. Russom, 5 Cir., 241 F.2d 296. The minimum required is to ascertain that as a fact and that cannot be done on a complaint and a mere motion to dismiss.

The subsidiary point that, under Johnson v. Maryland Casualty Company, 73 N.H. 259, 60 A. 1009, and Metropolitan Life Ins. Co. v. Henry, 217 Ind. 33, 24 N.E.2d 918—a doctrine in no way shown to be the law for Alabama or Italy—Walsh was the "agent" for the shipowner is equally unfounded in my judgment. First, it ignores the fact that in the "Independent Contractor's Extension Schedule" and in Special Endorsement Nos. 1, 5 and 6, the Assured is expressly made to include "principals whether steamship owners or charterers for whom Walsh Stevedoring Co. is loading or unloading." The Underwriter, for its own reasons, has accepted substantial premiums to make a contract with shipowners whose names and number are unknown. There is here no medium of an agency. Second, dismissed as it was on the complaint for failure to state a claim, it presumes a great deal for us as Judges to say that a shipowner had any reason to anticipate that any stevedore either had, or had undertaken to supply, such manna from heaven. In the contemporary climate in which a simple injury to a longshoreman aboard a vessel rings the curtain call for a three-ring Donnybrook, see, e. g., American President Lines v. Marine Terminals Corp., 9 Cir., 234 F.2d 753, 1956 A.M.C. 1229, certiorari denied 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161, 1956 A.M.C. 2428; United States v. Harrison & Jones Stevedoring Co., 9 Cir., 245 F.2d 911, 1957 A.M.C. 1264; Amerocean S.S. Co. v. Copp, 9 Cir., 245 F.2d 291, 1957 A.M.C. 749, in which longshoreman pursues shipowner who pursues stevedore who may implead a common Insurer suggests, at the mini-

mum, that whether a shipowner should be held to have failed to anticipate that his prospective adversary has provided insurance for his own protection is a question which, like all others, ought to be determined by facts, not pleadings. Certainly on the simple complaint and the defendant's motion to dismiss there was no basis for holding as a matter of law that in this unusual situation an Italian shipowner had to anticipate that its Alabama stevedore had provided this unique coverage. And in complete disregard of the rules this motion was granted in the face of a categorical allegation that the shipowner did not know of the existence of the policy.

Here the piper composed the piece. He wrote it for a special and unique concert. He was paid at least $1,500 for his efforts. He cannot rightfully complain that in spots it is discordant or that its cacophony is occasionally painful when played, or that it produces effects beyond the composer's expectations. He who paid the piper can call the tune. He ought at least to be able to hear it and access to the concert hall ought not to be barred because the ticket is too old.

I therefore dissent.